John W. Leardi
Christopher B. Bladel
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
609-799-5150

Leslie Howard
Michael Fried
COHEN HOWARD, LLP
766 Shrewsbury Ave., Suite 200
Tinton Falls, NJ 07724
732-747-5202

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUDITH A. ADIRZONE, | : |
| | : |
| *Plaintiff,* | : Case No. _____ |
| | : |
| - v. - | : |
| | : |
| THOMAS JEFFERSON UNIVERSITY | : **COMPLAINT** |
| HOSPITALS, INC., d/b/a JEFFERSON | : |
| HEALTH; and JEFFERSON HEALTH AND | : |
| WELFARE PLAN, | : |
| | : |
| *Defendants.* | : |
| | : |

Plaintiff JUDITH A. ADIRZONE ("Plaintiff" or "Ms. Adirzone"), hereby brings this Complaint against Defendants THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC. ("Jefferson Health"), and the JEFFERSON HEALTH AND WELFARE PLAN (the "Plan," "Jefferson Plan," or the "Plan Defendants") (collectively, "Defendants"), and hereby alleges upon her personal knowledge, the actions of her surgeons Joseph F. Tamburrino, M.D. ("Dr. Tamburrino") and Keith M. Blechman, M.D. ("Dr. Blechman"), and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made through her attorneys, as follows:

### THE PARTIES AND MS. ADIRZONE'S HEALTH PLAN

1.      Plaintiff, JUDITH A. ADIRZONE, is currently, and at all times relevant hereto, has

been a resident and citizen of the State of New Jersey within the meaning of 28 U.S.C. § 1332.

2.      At all times relevant hereto, JUDITH A. ADIRZONE, was a "beneficiary," as defined by 29 U.S.C. § 1002(8), of the JEFFERSON HEALTH AND WELFARE PLAN, an "Employee Health Benefit Plan," as defined by 29 U.S.C. § 1002(1), which was sponsored by Thomas Jefferson University.

3.      By virtue of her employment Jefferson Health, Plaintiff enrolled as a participant in the JEFFERSON HEALTH AND WELFARE PLAN.

4.      Defendant THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC., d/b/a Jefferson Health, is a Pennsylvania Domestic Nonprofit Corporation with its principal place of business at 111 S. 11th Street, Philadelphia, PA 19107, and is therefore a citizen of the Commonwealth of Pennsylvania within the meaning of 28 U.S.C. § 1332.

5.      Jefferson Health is the plan sponsor of the JEFFERSON HEALTH AND WELFARE PLAN, a self-funded group health benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 to 1461, which is administered for the benefit of covered employees including Ms. Adirzone.

6.      The plan administrator of the JEFFERSON HEALTH AND WELFARE PLAN is TJU & Jefferson Health, with an address of 1200 Old York Road Abington, PA 19001-3788.[1]

7.      As plan administrator, TJU & Jefferson Health has a duty to ensure that that Jefferson Plan is administered for the benefit of its enrolled members, including but not limited to Ms. Adirzone.

8.      The Jefferson Plan designates Aetna Life Insurance Company ("Aetna") as the

_____

[1] *See* IDS Choice POS II - Platinum Plan, 2019, for the Jefferson Health Self-Funded Health Plan, at p. 87 of 92 ("2019 Plan Booklet").

Claims Administrator for all medical and prescription drug coverage claims under the Plan.[2]

9.      In that role, Aetna receives, reviews, and processes benefits claims for services rendered by in-network and out-of-network medical providers for the self-funded health plan sponsored by Jefferson Health.

10.      Aetna is in the business of insuring and/or administering health plans, many of which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 to 1461 (the "Aetna Plans"). In that role, Aetna receives, reviews, and/or processes benefits claims for services rendered by in-network and out-of-network medical providers to individuals enrolled in Aetna Plans ("Aetna Members").

## JURISDICTION AND VENUE

11.      Defendants' actions in administering employer-sponsored self-funded health care Plan, including setting payment rates for ONET benefits under its Plans, are governed by ERISA. Thus, subject-matter jurisdiction is appropriate over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

12.      Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) based on Ms. Adirzone's residence in New Jersey, that the covered healthcare services she received that are the subject of this action occurred in New Jersey. Venue is also appropriate under 29 U.S.C. § 1132(e)(2) because Defendants may be found here and are authorized to do business in New Jersey, either directly or through wholly owned and controlled subsidiaries.

13.      This Court has personal jurisdiction over the Defendants because they have substantial contacts with, and regularly conduct business in, New Jersey.

---

[2] Jefferson Health and Welfare Plan Summary Plan Description and Plan Document, 2019, at p. 65 of 7677 (hereinafter "SPD").

## FACTUAL BACKGROUND

A.     **The Jefferson Plan, Relevant Provisions**

14.     Plaintiff is a fifty-five (55) year old woman who was employed by Jefferson Health and through her employment was enrolled in the Jefferson Plan, which provided health benefits through a "self-funded" health plan administered by third-party claims administrator Aetna.

15.     As a "self-funded" plan, the Jefferson Plan's plan sponsor is responsible for payment of claims from its own funds and those contributed by employees. Aetna acts as a third-party fiduciary and claims administrator for the health benefits provided under the Jefferson Plan.

16.     In its capacity as plan sponsor, Jefferson Health crafted and published the "Jefferson Health and Welfare Plan Summary Plan Description and Plan Document," (hereinafter "SPD") which, along with the documents incorporated by reference, describes the health benefits provided by the Jefferson Plan.

17.     The Jefferson Health SPD, and documents incorporated by reference, detail the plan "provisions governing the use of network providers, the composition of the provider network and whether, and under what circumstances, coverage is provided for out-of-network services."[3]

18.     At all times relevant hereto, Plaintiff was enrolled in an Aetna Choice POS II plan that was part of Aetna's National Advantage Program ("NAP").

19.     Aetna prepared and the Jefferson Plan provided Plaintiff with the Aetna Choice POS II Medical Plan Booklet (hereinafter "2019 Plan Booklet"), which, along with the aforementioned Summary Plan Description, described the scope of plan benefits as well as plan definitions, policies, and procedures that plan participants and plan fiduciaries must follow.

20.     The 2019 Plan Booklet states in relevant part, "This is your booklet. It is one of two

_____

[3] SPD, at p. 10 of 7677.

documents that together describe the benefits covered by your Employer's self-funded health benefit plan for in-network and out-of-network coverage."[4]

21.     Plaintiff's Jefferson Plan "provides in-network and out-of-network coverage for medical, vision and pharmacy benefits."[5]

22.     Most Aetna-affiliated group health plans cover health care services received by Aetna Members from either in-network ("INET") providers (who have negotiated contracts with Aetna and agreed to accept a reduced amount from billed charges for the services rendered) or out-of-network ("ONET") providers (who are not contracted with Aetna and have not agreed to accept payments based on Aetna and its agents' reimbursement determinations).

23.     The Jefferson Plan defines a "network provider" (hereinafter "INET") as "[a] provider listed in the directory for your plan. However, a NAP provider listed in the NAP directory is not a network provider.

24.     The Jefferson Plan defines an "out-of-network provider" (hereinafter "ONET") as "a provider who is not a network provider."[6]

25.     The Jefferson Plan defines the amount in benefits to be paid for a particular covered service under the plan to be based on a "Negotiated Charge" for INET providers and a "Recognized Charge" for ONET providers: "When we say "expense" in this general rule, we mean the negotiated charge for a network provider, and the recognized charge for an out-of-network provider."[7]

26.     Regarding Plaintiff's ONET benefits, the Jefferson Plan provides:

---

[4] 2019 Plan Booklet, at p. 3 of 92.

[5] *Id.* at p. 6 of 92.

[6] *Id.* at p. 81 of 92.

[7] *Id.* at p. 50 of 92.

You also have access to out-of-network providers. This means you can receive eligible health services from an out-of-network provider. If you use an out-of-network provider to receive eligible health services, you are subject to a higher out-of-pocket expense and are responsible for:

- Paying your out-of-network deductible
- Your out-of-network payment percentage
- Any charges over our recognized charge
- Submitting your own claims and getting precertification.[8]

27.     In stating that a participant in the Jefferson Plan may be responsible for "[a]ny charge over [Aetna's] recognized charge," the Jefferson Plan is stating that plan participants who receive medical care from ONET providers may be subject to "balance billing" from such providers for any amounts over and above the Recognized Charge the Plan may pay.

28.     Importantly, the Jefferson Plan provides that "Recognized charge does not apply to involuntary services," and the Plan defines "Involuntary Services" as follows:

> Involuntary services are services or supplies that are one of the following:
> - Performed at a network facility by an out-of-network provider, unless that out-of-network provider is an assistant surgeon for your surgery
> - Not available from a network provider
> - Emergency services

29.     Further, under the Women's Health Cancer Rights Act of 1998 ("WHCRA") 29 U.S.C. § 1185b, adopted as part of ERISA, once an ERISA plan provides coverage for a mastectomy, coverage is required to be provided for breast reconstruction in a manner determined by the member and her physician. Thus, ERISA-governed health plans, including the Jefferson Plan at issue in this case, must therefore provide coverage for breast reconstruction after a mastectomy under WHCRA. WHCRA: (i) requires that post-mastectomy breast reconstruction

---

[8] *Id.* at p. 49 of 92.

surgery be covered under the terms of the Jefferson Plan; and (ii) prohibits plan administrators and/or third-party claims administrators from placing unreasonable restrictions or limitations on reimbursement for post-mastectomy breast reconstruction. Notably, WHCRA applies to postmastectomy breast reconstruction even in the absence of a diagnosis of breast cancer.

30.    The Jefferson Plan acknowledges its obligations under WHCRA and, to that end, provides that:

> Under this health plan, as required by the Women's Health and Cancer Rights Act of 1998, coverage will be provided to a person who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with the mastectomy for:
>
> (1) all stages of reconstruction of the breast on which a mastectomy has been performed;
> (2) surgery and reconstruction of the other breast to produce a symmetrical appearance;
> (3) prostheses; and
> (4) treatment of physical complications of all stages of mastectomy, including lymphedemas.
>
> **This coverage will be provided in consultation with the attending physician and the patient**, and will be provided in accordance with the plan design, limitations, copays, deductibles, and referral requirements, if any, as outlined in your plan documents.[9]

31.    The Jefferson Plan SPD similarly states:

> **Women's Health and Cancer Rights Act**
>
> The health benefits program will provide certain benefits related to benefits received in connection with a mastectomy. The health benefits program will include reconstructive surgery following a mastectomy.
>
> If you or your dependent(s) (including your spouse) are receiving medical benefits under the health benefits program in connection with a mastectomy and you or your dependent(s) (including your spouse) elect breast reconstruction, the coverage will be provided in

---

[9] *Id.* at p. 89 of 92

a manner determined in consultation with the attending physician for all stages of reconstruction of the breast on which the mastectomy was performed; surgery and reconstruction of the other breast to produce a symmetrical appearance; prostheses; and treatment of physical complications of the mastectomy, including lymphedemas.

Reconstructive benefits are subject to annual health benefits program deductibles and coinsurance provisions like other medical and surgical benefits covered under the health benefits program.[10]

32.     Plaintiff brings this action for plan benefits that were improperly denied her, or provided at inadequate levels, contrary to the terms of the Jefferson Plan and the Defendants' fiduciary duty to ensure that the Plan is administered in accordance with the plan terms for the benefit of Plan participants, in particular Ms. Adirzone.

**B.     Plaintiff's course of treatment**

33.      Ms. Adirzone is a breast cancer survivor.

34.     On October 21, 2019, Ms. Adirzone presented to Jefferson Washington Township Hospital, formerly known as Kennedy University Hospital, at 435 Hurffville-Cross Keys Road, Washington Township, NJ 08080, for an approved bilateral mastectomy rendered by surgeon Diane R. Gillum, M.D.

35.     Rather than undergo the risk of one or more additional surgeries subsequent to the bilateral mastectomy, which would require recovery time followed by a second hospital admission, anesthesia, risk of infection, and further post-surgical recovery, Plaintiff elected to undergo an immediate bilateral breast reconstruction procedure with trained surgeons specializing in plastic surgery and microsurgery concurrently with the bilateral mastectomy performed on October 21, 2019, at Jefferson Washington Township Hospital.

---

[10] SPD, at p. 19 of 7677.

36.     Notably, Jefferson Washington Township Hospital is part of the Jefferson Health system and at all times relevant hereto has been owned and operated by defendant THOMAS JEFFERSON UNIVERSITY HOSPITALS, INC.

37.     Dr. Gillum, the principal surgeon performing the bilateral mastectomy, consulted with Plaintiff regarding her options for the method and timing of undergoing breast reconstruction surgery.

38.     Dr. Gillum is an Aetna INET physician and therefore her services are covered by the INET provisions of the Jefferson Plan.

39.     The post-mastectomy breast reconstruction procedure Plaintiff elected in consultation with her physician, Dr. Gillum, was a deep inferior epigastric perforator ("DIEP") flap procedure; the name coming from the deep inferior epigastric artery, which is the blood supply to fat and skin of the abdomen.

40.     A DIEP flap microsurgery is a type of microvascular breast reconstruction in which blood vessels called deep inferior epigastric perforators, as well as the skin and fat connected to them, are removed from the lower abdomen, and transferred to the chest to reconstruct a breast after mastectomy without the sacrifice of any of the abdominal muscles. It requires an incision into the abdominal (rectus) muscle, as the blood vessels, or perforators, required to keep the tissue alive lie just beneath or within this muscle. Therefore, a small incision is made in the abdominal muscle to access the vessels. After the skin, tissues, and perforators (collectively known as the "flap") have been dissected, the flap is transplanted and connected to the patient's chest using microsurgery. The microsurgeon then shapes the flap to create the new breast. As no abdominal muscle is removed or transferred to the breast, patients typically see a lower risk of losing abdominal muscle strength and may experience a faster recovery compared to other procedures.

41.     Thus, the DIEP flap is the gold-standard for post-mastectomy breast reconstruction.[11]

42.     The DIEP flap microsurgical breast reconstruction surgery is a lengthy (8 to 12 hours), complex procedure that requires multiple trained surgeons to be performed safely. But it provides significantly better cosmetic results, has fewer donor site complications, is muscle-sparing, and presents a lower risk of reconstruction failure.

43.     Plaintiff, in consultation with her principal surgeon, Dr. Gillum, identified the appropriate plastic surgeons with the appropriate skill and experience in microsurgery to perform the post-mastectomy bilateral DIEP flap breast reconstruction. Plaintiff and Dr. Gillum identified Dr. Tamburrino and Dr. Blechman.

44.     Dr. Tamburrino is a double-board certified, fellowship trained plastic surgeon with offices located at 1765 Springdale Road, Suite 1, Cherry Hill, NJ 08003, and 800 W State Street, Suite 300, Doylestown, PA 18901. He is renowned for his innovative work with breast reconstruction for patients who have survived cancer.

45.     Dr. Blechman is a board-certified plastic and reconstructive surgeon. He is a graduate of New York University School of Medicine and completed the prestigious six-year residency program in plastic surgery at New York University School of Medicine. Thereafter, he completed a fellowship in reconstructive microsurgery at the renowned MD Anderson Cancer

---

[11] *See, e.g.,* Hamdi M, Rebecca A. The Deep Inferior Epigastric Artery Perforator Flap (DIEAP) in Breast Reconstruction. *Semin. Plast. Surg.* 2006 May; 20(2): 95–102; Hamdi M, Blondeel P, Landuyt K Van, Tondu T, Monstrey S. Bilateral autogenous breast reconstruction using perforator free flaps: a single center's experience. *Plast. Reconstr. Surg.* 2004;114:83–89; Hamdi M, Weiler-Mithoff E, Webster M H. Deep inferior epigastric perforator flap in breast reconstruction: experience with the first 50 flaps. *Plast. Reconstr. Surg.* 1999; 103:86–95; Blondeel P N. One hundred free DIEP flap breast reconstructions: a personal experience. *Br. J. Plast. Surg.* 1999; 52:104–111.

Center in Houston, Texas. He is chair of the PlastyPAC Board of Governors of the *American Society of Plastic Surgeons* and sits on the Board of Trustees of the *New York Regional Society of Plastic Surgeons* and the Executive Council of the *New York State Society of Plastic Surgeons*.

46.     Prior to undergoing the bilateral mastectomy and DIEP flap breast reconstruction procedures, Dr. Tamburino, who was to be one of the co-surgeons performing the DIEP flap surgery, sought an in-network exception approval request from Aetna so that his services, as an ONET surgeon, would be covered under the Jefferson Plan.

47.     Aetna, acting in its capacity as claims administrator, issued a decision by letter dated October 8, 2019, denying Plaintiff's request for an in-network exception for Dr. Tamburrino.

48.     The October 8, 2019, Aetna denial letter stated in part that the request was denied because "your condition and circumstances shows that a participating provider in your area can provide the services you are requesting."

49.     The specific service Plaintiff was requesting was the DIEP flap microsurgery for post-mastectomy breast reconstruction.

50.     The Aetna denial letter went on to identify two INET physicians who Aetna claimed "provide these **types** of services." (emphasis added). Notably, in the denial letter, Defendants' claims administrator did not assert that either of the two INET surgeons it identified had performed or were proficient in performing DIEP flap microsurgery for breast reconstruction.

51.     Plaintiff consulted with one of the INET surgeons, Dr. Brett A. Garber, D.O. who Aetna identified in its October 8, 2019, denial letter. Dr. Gerber expressly confirmed to Ms. Adirzone that he cannot perform the necessary procedures entailed in a bilateral DIEP flap microsurgery.

52.     On information and belief, the second INET surgeon Aetna identified, Julia A.

Spears, M.D. of Metropolitan Plastics, (who is also affiliated with Defendant Jefferson Health) likewise was not in a position to perform the necessary procedures entailed in a bilateral DIEP flap microsurgery in October 2019.

53.     Although Dr. Garber or other Aetna INET physicians may have been able to provide other "*types*" (as stated in the October 8, 2019, denial letter bearing Aetna case # 4380848010000000) of plastic surgical procedures, there was no INET surgeon(s) who could perform the complex microsurgery involved in a DIEP flap microsurgery.

54.     Thus, Defendants' claim administrator denied INET benefits to Plaintiff, a Plan participant, for the form of post-mastectomy breast reconstructive surgery by wrongfully asserting, as stated in the October 8, 2019, in-network exception denial letter that "a participating provider in your area can provide the services you are requesting."

55.     By correspondence dated October 11, 2019, Defendants' claims administrator Aetna issued a separate decision (assigned case # 0265828010000000) on the request for coverage of the DIEP flap breast reconstruction. Aetna approved the procedure to be performed by Drs. Tamburrino and Blechman as co-surgeons, with Dr. Garber, the INET surgeon who confirmed to Plaintiff that he was not able to perform the DIEP flap breast reconstruction, acting as assistant surgeon.

56.     Specifically, Aetna agreed that the following procedures and CPT codes associated with the various aspects of the Plaintiff's bilateral breast reconstruction were covered by the Jefferson Plan at **out-of-network benefit levels only** for Drs. Tamburrino and Blechman:

| Service Dates: | Procedure Code: | Service Description: | Modifier Code: | Modifier Description: | Number: | Type of Service: |
|---|---|---|---|---|---|---|
| 10/21/2019 - 10/21/2019 | 35761 | EXPLORATION; OTHER VESSELS | 50 | BILATERAL PROCEDURE | 1 | Time(s) |

| Service Dates: | Procedure Code: | Service Description: | Modifier Code: | Modifier Description: | Number: | Type of Service: |
|---|---|---|---|---|---|---|
| 10/21/2019 - 10/21/2019 | 32900 | RESECTION OF RIBS, EXTRAPLEURAL, ALL STAGES ) TO TEST VASCULAR FLOW IN FLAP OR GRAFT | 50 | BILATERAL PROCEDURE | 1 | Time(s) |

| Service Dates: | Procedure Code: | Service Description: | Modifier Code: | Modifier Description: | Number: | Type of Service: |
|---|---|---|---|---|---|---|
| 10/21/2019 - 10/21/2019 | S2068 | BREAST RECONSTRUCTION WITH DEEP INFERIOR EPIGASTRIC PERFORATOR (DIEP) FLAP OR SUPERFICIAL INFERIOR EPIGASTRIC ARTERY (SIEA) FLAP, INCLUDING HARVESTING OF THEFLAP, MICROVASCULAR TRANSFER, CLOSURE OF DONOR SITE AND SHAPING THE FLAP INTO ABREAST, UNILATERAL | 50 | BILATERAL PROCEDURE | 1 | Time(s) |

| Service Dates: | Procedure Code: | Service Description: | Modifier Code: | Modifier Description: | Number: | Type of Service: |
|---|---|---|---|---|---|---|
| 10/21/2019 - 10/21/2019 | 15860 | INTRAVENOUS INJECTION OF AGENT (EG, FLUORESCEIN | 50 | BILATERAL PROCEDURE | 1 | Time(s) |

[Aetna Coverage Letter, Oct. 11, 2019].

57.    Copies of Aetna's October 11, 2019, coverage determination letter were sent to

Plaintiff, Dr. Gillum, Dr. Tamburrino, Dr. Blechman, and Jefferson Washington Township

Hospital, formerly known as Kennedy University Hospital.

58.     In approving the surgical procedures, however, Defendants' claim administrator qualified that:

> This service is approved at an out-of-network benefit level. The provider identified to provide this service does not participate with this plan. The member will be responsible for out-of-network cost-sharing requirements and for any difference between the provider's charge and the amount the plan covers.

59.     Thus, Plaintiff and her principal surgeon performing the bilateral mastectomy, Dr. Gillum, were required to choose between either seeking another form of breast reconstructive surgery from an INET provider other than Plaintiff's preference for DIEP flap breast reconstruction, or proceed with Plaintiff's preferred surgical option, for which there was no INET provider in Ms. Adirzone's geographic area as described in the Jefferson Plan.

60.     On October 21, 2019, Dr. Gillum, the INET general surgeon, performed the approved bilateral mastectomy followed immediately by Dr. Tamburrino and Dr. Blechman, as co-surgeons, performing the DIEP flap microsurgery. Drs. Tamburrino and Blechman were assisted by Brett A. Garber, D.O., the Aetna INET plastic surgeon that advised Plaintiff he could not perform the DIEP flap microsurgical procedures required for her surgery.

61.     Dr. Tamburrino's operative report for the DIEP flap procedure states the following with regard to the risks of the procedure and the need for two fellowship-trained microsurgeons to perform the DIEP flap breast reconstruction:

> The patient is a 51-year-old female with a recently diagnosed right breast cancer. For treatment of her breast cancer, she is undergoing a bilateral mastectomy by Dr. Diane Gillum and has opted for immediate breast reconstruction. The patient was seen in consultation and after all risks, benefits, and alternatives, she was seeking a breast reconstruction using her own abdominal tissue with deep inferior epigastric perforator flaps. Risks, benefits, and alternatives to the procedure were explained in detail and she was in

is in agreement with the surgical plan as stated.

Please note that there was a co-surgeon being utilized on this surgical procedure. This is being done to ensure the patient's safety as there were multiple independent portions of the operations going on simultaneously including recipient vessel exposure in the chest as well as elevation of the flaps on the abdomen as well as microvascular anastomoses being performed under an operating microscope by [two] 2 fellowship trained microsurgeons. Dr. Blechman and I both meet these criteria and this is to ensure the safest possible patient's [*sic*] outcome.

62.     Dr. Tamburrino's operative report continues to describe the manner in which the DIEP flap procedure was done concurrently with the bilateral mastectomy that Dr. Gillum performed:

Dr. Gillum began the procedure by starting with a left mastectomy. Please refer to her operative dictation for details regarding the mastectomy portions of the procedure. **At the same time, Dr. Blechman and I began harvesting the abdominal flaps**. We began by incising the upper abdominal skin marking above the umbilicus. The skin and subcutaneous tissue above the umbilicus were then elevated to the level of the xiphoid. (emphasis added)

63.     Further, Dr. Tamburrino's operative report confirms that the INET plastic surgeon, Dr. Garber, performed surgical services that did not involve the complex and specialized microsurgical education, training, and experience for the DIEP flap breast reconstruction, "Abdominal closure was being performed by Dr. Garber while Dr. Blechman and I performed the microvascular anastomoses."

64.     Following Plaintiff's October 21, 2019, surgeries at Jefferson Washington Township Hospital, Dr. Tamburrino and Dr. Blechman submitted claims to Defendants' claims administrator, Aetna, for payment of plan benefits for the covered services they provided to Ms. Adirzone when performing the DIEP flap bilateral breast reconstruction.

**C.      Dr. Tamburrino's Claim Submission and Appeals of the Claim Determination**

65.      Dr. Tamburrino submitted a bill to Defendants' claims administrator, Aetna, for the services he personally rendered during Plaintiff's DIEP flap reconstruction. The service codes were billed by Dr. Tamburrino, and paid by the Jefferson Plan, as follows:

| Service Code | Billed Amount | Paid Amount |
|---|---|---|
| S2068-62-LT | $70,000.00 | $2,155.41 |
| S2068-62-RT | $70,000.00 | $1,077.70 |
| 32900 | $18,876.00 | $223.20 |
| 35761-LT | $5,698.68 | $148.96 |
| 35761-RT | $5,698.68 | $0.00 |
| 15860 | $1,440.53 | $33.77 |
| <u>**TOTALS:**</u> | $171,713.89 | $3,639.04 |

66.      In an Explanation of Benefits ("EOB") dated November 19, 2019, provided to both Dr. Tamburrino and Plaintiff, Aetna explained its decision to deny coverage for Dr. Tamburrino's billed charges as follows:

| Service Code | Billed Amount | Amount Paid | Coverage Denial Explanation |
|---|---|---|---|
| S2068-62-LT | $70,000.00 | $2,155.41 | *The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at 62.5% of the usual rate due to co-surgeon modifier 62. [X02]* |
| S2068-62-RT | $70,000.00 | $1,077.70 | *The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at half of the usual co-surgeon rate. The member is not responsible for this amount. [X04]* |
| 32900 | $18,876.00 | $223.20 | *The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at the reasonable and customary* |

| | | | |
|---|---|---|---|
| | | | *rate which is 25% of the single procedure rate due to multiple surgical procedures performed on the same date of service. [U67]* |
| 35761-LT | $5,698.68 | $148.96 | *The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at 50% of the reasonable and customary rate due to multiple procedures performed on the same date of service. [U65]* |
| 35761-RT | $5,698.68 | $0.00 | *The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at the reasonable and customary rate which is 25% of tile single procedure rate due to multiple surgical procedures performed on the same date of service. [U67]* |
| 15860 | $1,440.53 | $33.77 | *The member's plan provides coverage for charges that are reasonable and appropriate. This procedure has been paid at the reasonable and customary rate which is 25% of the single procedure rate due to multiple surgical procedures performed on the same date of service. [U67]* |

67.     Consequently, of Dr. Tamburrino's billed charges of $171,713.89 for surgical services rendered to Plaintiff, the Jefferson Plan paid only $3,639.04, or just over two percent (2%) of the billed charges.

68.     On April 16, 2020, Dr. Tamburrino, through counsel, submitted a "First Level Member Appeal" on behalf of Ms. Adirzone specifically challenging the decision of Defendants' claim administrator. The First Level Member Appeal was sent to both Aetna via certified mail and to the attention of Joseph Abbondandolo of the Plan Administrator (TJU & Jefferson Health) via

e-mail.

69.     By correspondence dated June 30, 2020, Aetna responded to the First Level Member Appeal by upholding its determination that the Jefferson Plan was responsible for only $3,693.04 of Dr. Tamburrino's billed charges.

70.     In that June 30, 2020, letter, Aetna stated it had reviewed the operative notes, the Summary Plan Description, the appeal request, and the following denial codes: (1) *Denial code: (U67) Your plan pays for charges we find to be reasonable. When there is more than one service performed on the same day, different rates apply. This service was paid at 25%*; and (2) *Denial code: (V64) The payment for this service is included in the contracted and/or case rate paid to the provider. You are not responsible for this amount; except for applicable copay, deductible, coinsurance.*

71.     In upholding the original claim determination, Aetna reasoned, incorrectly, that Dr. Tamburrino was an Aetna INET provider and that his billed charges were paid correctly in accordance with the terms of the Jefferson Plan. Specifically, Aetna's denial of the First Level Member Appeal stated:

> You have asked us to review your appeal and reconsider coverage for inpatient hospital services rendered by Dr. Joseph Tamburrino October 21, 2019. This request is based on the information provided because you disagree with our previous detern1ination.
>
> After careful review, we have determined that you [Dr. Tamburrino] are an in-network provider. A contract exists between you and Aetna therefore, claims are priced based on the negotiated charge designated by the health plan. The in-network benefits apply a deductible limit of $250.00 then pays 90% leaving the member responsible for the remaining l 0%. The portion of the claim that exceeds what the plan has determined to be the reasonable and customary charge is not eligible for reimbursement. Additionally, when accessing in-network care, the member is responsible for any non-covered service based upon the plan of benefits. copayment, coinsurance, and deductible, if applicable.

72.     On August 28, 2020, Dr. Tamburrino, through counsel, submitted a "Second Level Member Appeal" on behalf of Ms. Adirzone reiterating that as a result of the claim determination, Ms. Adirzone was had been left with an out-of-pocket responsibility of $168,074.85 unless the claim was resolved in accordance with the Jefferson Plan. The Second Level Member Appeal was sent to both Aetna via certified mail and to the attention of Joseph Abbondandolo of the Plan Administrator (TJU & Jefferson Health) via e-mail.

73.     Dr. Tamburrino's Second Level Member Appeal noted that Aetna's response to the First Level Member Appeal contained numerous errors that, essentially, resulted in Ms. Adirzone having wasted one level of her appeal rights under the Jefferson Plan because Aetna did not read the documents in the files that it claimed were reviewed:

> In Aetna's response to the First Level appeal, several false statements were made. They include the following:
>
> 1. We have determined that you are an in-network provider.
>
> 2. A contract exists between you and Aetna therefore, claims are priced based on the negotiated charge designated by the health plan.
>
> 3. The in-network benefits apply a deductible limit of $250.00 then pays 90% leaving the member responsible for the remaining 10%.
>
> Dr. Tamburrino is **NOT** an in-network provider with Aetna or any of their affiliated companies. A contract does **NOT** exist between Dr. Tamburrino and Aetna. A negotiation did NOT take place for this claim. The EOB clearly indicates the claim was processed out-of-network as evidenced not only by the "Network Status" but by the application of the $500.00 deductible to the member liability. Clearly, the reviewer is misinformed. These errors have inhibited the appeal processed by utilizing one of the limited number of appeals available to the member. Had the claims record been reviewed in its entirety including the authorization, the reviewer would have been aware of the established record demonstrating the numerous attempts our client had made to request an in-network

exception for Ms. Adirzone, a breast cancer survivor. Aetna has inadequately responded to all of the issues raised on appeal and engaged in a course of bad faith in their handling of this claim.

74.     Aetna refused to reverse its claim determination and stood by its denial of all but $3,693.04 of Dr. Tamburrino's billed charges.

75.     Despite having also submitted the First and Second Level Member Appeals to the Plan Administrator of the Jefferson Plan, neither of the Defendants took any action to ensure that Aetna administered the claims Dr. Tamburrino submitted on behalf of Ms. Adirzone were processed and paid in accordance with the terms of the Jefferson Plan.

76.     Thus, any administrative remedies that may be required to be pursued under ERISA have, therefore, been exhausted, should be deemed exhausted under applicable regulations, or would be futile under the circumstances, and are therefore excused as it related to Plaintiff's pursuit of plan benefits for the claims submitted on her behalf by Dr. Tamburrino.

**D.     Dr. Blechman's Claim Submission and Appeals of the Claim Determination**

77.     Similarly, Dr. Blechman submitted a bill to Defendants' claims administrator, Aetna, for the services he personally rendered during Plaintiff's DIEP flap reconstruction. The service codes were billed by Dr. Blechman, and paid by the Jefferson Plan, as follows:

| Service Code | Billed Amount | Paid Amount |
|---|---|---|
| S2068-62-LT | $70,000.00 | $0.00 |
| S2068-62-RT | $70,000.00 | $0.00 |
| 32900-80-LT | $15,074.00 | $394.91 |
| 32900-80-RT | $15,074.00 | $0.00 |
| 35761-80 | $4,480.00 | $0.00 |
| 15860-80 | $1,544.00 | $0.00 |
| **TOTALS:** | $177,432.00 | $394.91 |

78.     On April 23, 2020, Dr. Blechman, through counsel, submitted a "First Level

Member Appeal" on behalf of Ms. Adirzone specifically challenging the decision of Defendants' claim administrator. The First Level Member Appeal was sent to both Aetna via facsimile certified mail and to the attention of Joseph Abbondandolo of the Plan Administrator (TJU & Jefferson Health) via facsimile.

79.     By correspondence dated June 16, 2020, Defendants' claim administrator, Aetna, upheld its initial claim determination of November 7, 2019, (which was first communicated to Plaintiff in an EOB dated November 28, 2019) concerning services Dr. Blechman rendered to Ms. Adirzone, reasoning that the appeal was untimely.

80.     On September 16, 2020, Dr. Blechman, through counsel, submitted a "Second Level Member Appeal" on behalf of Ms. Adirzone reiterating that as a result of the claim determination, Ms. Adirzone had been left with an out-of-pocket responsibility of $177,037.09 unless the claim was resolved in accordance with the Jefferson Plan. The Second Level Member Appeal was sent to both Aetna via certified mail and to the attention of Joseph Abbondandolo of the Plan Administrator (TJU & Jefferson Health) via e-mail.

81.     Further, the Second Level Member Appeal demonstrated that the First Level Member Appeal was **not untimely** and provided proof that Aetna had received, and acknowledged, that Plaintiff, through Dr. Blechman and his counsel, submitted a timely appeal of the November 7, 2019, initial claim determination:

> A timely appeal was submitted raising several issues, including the failure to grant an in-network exception, and requesting plan documents. Instead of responding to the matters raised on the appeal, Aetna simply asserted that the appeal was untimely. The appeal is dated within the 180-day period from the EOB dated November 28, 2019 under the plan the appeal deadline should have been May 26, 2020. Our office has a fax confirmation showing Aetna received the appeal on May 15, 2020 and a phone call to Aetna verified the Appeal was uploaded on May 26, 2020. In addition, **appeal deadlines have been extended until further**

> **notice due to COVID-19**. Aetna should have responded in good faith, with meaningful dialogue. Accordingly, the denial of the appeal violates applicable law. (emphasis in original)

82.     By correspondence dated November 17, 2020, Aetna upheld the claim determination reasoning that Dr. Blechman was merely an "assistant" surgeon, when in fact he was a co-surgeon on an approved DIEP flap breast reconstruction:

> Our payment policy does not consider an assistant at surgery to be necessary for the billed procedure(s). We have reviewed your appeal and determined that the assistant at surgery does not meet coverage criteria and is not eligible for payment. Our payment policy allows for an assistant surgeon for certain types of surgeries/procedures.

83.     By correspondence dated December 21, 2020, Dr. Blechman, through counsel, submitted a request for an External Appeal to Aetna's External Appeals Unit further challenging the token payment of $394.91 and detailing why a co-surgeon was necessary to perform the complex microsurgical procedures of a DIEP flap bilateral breast reconstruction, i.e. the use of co-surgeons was medically necessary:

> According to the Centers for Medicare and Medicaid (CMS) the CPT code 15860, when appended with an 80 modifier to reflect an assist-at-surgery, is considered medically necessary with the submission of documentation. Aetna failed to review or even request the operative report prior to denying these services. Furthermore, NJ Administrative Code 13:35-4.1 states the services of an assistant surgeon are required during a major surgical procedure. By denying this claim, Aetna has violated NJ State law and has breached its fiduciary duty to the member.
>
> *     *     *
>
> The DIEP Flap is a cutting-edge breast reconstruction procedure that uses a flap of complete tissue, blood vessels, skin and fat from a woman's lower abdomen as donor tissue. The flap is then transplanted to the chest where those removed blood vessels are reconnected to the vessels in the chest. The flap is then shaped into the new breast and the abdomen is surgically closed. Unlike the TRAM flap, the DIEP Flap preserves the abdominal muscle(s) thus allowing for preservation of abdominal strength and integrity. The

procedure requires two micro-surgeons and at times, both a first and second assist, working together in unison for approximately 8-12 hours. There are few surgeons with the proper training and skill to perform this complex procedure.

84.     Further, as noted above, Dr. Tamburrino's operative report stated:

Please note that there was a co-surgeon being utilized on this surgical procedure. This is being done to ensure the patient's safety as there were multiple independent portions of the operations going on simultaneously including recipient vessel exposure in the chest as well as elevation of the flaps on the abdomen as well as microvascular anastomoses being performed under an operating microscope by [two] 2 fellowship trained microsurgeons. Dr. Blechman and I both meet these criteria and this is to ensure the safest possible patient's [*sic*] outcome.

85.     Neither Aetna, nor the Jefferson Plan, provided any explanation as to why Aetna had a policy to deny Plaintiff plan benefits for a co-surgeon, particularly where the reasons for the need for a co-surgeon trained in microsurgery was set forth clearly in the operative report.

86.     After appeals to Defendants' claims administrator, Aetna issued a revised EOB dated March 28, 2022, provided to both Dr. Blechman and Plaintiff. In that EOB, Aetna explained its decision to deny coverage for Dr. Blechman's billed charges as follows:

| Service Code | Billed Amount | Amount Paid | Coverage Denial Explanation |
|---|---|---|---|
| S2068-62-LT | $70,000.00 | $917.53 | *The member's plan provides benefits for covered expenses at the reasonable charge for the service in the geographical area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas. You are not part of our network and therefore we cannot prevent you from billing the member for any balance. But if you do, we reserve the right to challenge your bill.* |

| | | | |
|---|---|---|---|
| | | | *Note: Some state laws prohibit you from balance billing a fully insured member. Confirm the member's plan funding, then refer to the state's regulation. [W39]* |
| S2068-62-RT | $70,000.00 | $3,140.02 | *The member's plan provides benefits for covered expenses at the reasonable charge for the service in the geographical area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas. You are not part of our network and therefore we cannot prevent you from billing the member for any balance. But if you do, we reserve the right to challenge your bill.*<br><br>*Note: Some state laws prohibit you from balance billing a fully insured member. Confirm the member's plan funding, then refer to the state's regulation. [W39]* |
| 32900-80-LT | $15,074.00 | $1,130.69 | *The member's plan provides benefits for covered expenses at the reasonable charge for the service in the geographical area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas. You are not part of our network and therefore we cannot prevent you from billing the member for any balance. But if you do, we reserve the right to challenge your bill.*<br><br>*Note: Some state laws prohibit you from balance billing a fully insured member. Confirm the member's plan funding, then refer to the state's regulation. [W39]* |

| 32900-80-RT | $15,074.00 | $0.00 | *The member's plan provides coverage for charges that are reasonable and appropriate as determined by us. This procedure exceeds the maximum number of services allowed under our guidelines for a single date of service. [V29]* |
|---|---|---|---|
| 35761-80 | $4,480.00 | $0.00 | *The member's plan provides benefits for covered expenses at the reasonable charge for the service in the geographical area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas. You are not part of our network and therefore we cannot prevent you from billing the member for any balance. But if you do, we reserve the right to challenge your bill.*<br><br>*Note: Some state laws prohibit you from balance billing a fully insured member. Confirm the member's plan funding, then refer to the state's regulation. [W39]* |
| 15860-80-LT | $1,544.00 | $0.00 | *The prevailing reimbursement for this surgery includes any elective services of a surgeon or nurse assisting the operating surgeon. Therefore, the charge for the assistant surgeon, co-surgeon, or surgical team is not covered under the member's plan. [748]*<br>*Your claim has been separated to expedite handling. You will receive a separate notice for the other services reported. (E73)* |

87.    Thus, pursuant to the revised EOB dated March 28, 2022, Aetna determined that of Dr. Blechman's billed charges of $177,432.00, the Jefferson Plan was responsible only for $4,270.71. Having previously authorized payment of $394.91, Aetna, acting as claims administrator, authorized an additional payment of $3,875.80 by the Jefferson Plan to Dr.

Blechman.

88.     Consequently, of Dr. Blechman's billed charges of $177,432.00 for surgical services rendered to Plaintiff, the Jefferson Plan paid only $4,270.71, or approximately 2.4% of the billed charges.

89.     Ms. Adirzone, therefore, has been left with a total out-of-pocket responsibility of $345,111.94 to Drs. Tamburrino and Blechman unless the claims for their surgical services is resolved in accordance with the Jefferson Plan.

90.     Despite having also submitted the First and Second Level Member Appeals to the Plan Administrator of the Jefferson Plan, neither of the Defendants took any action to ensure that Aetna administered the claims Dr. Blechman submitted on behalf of Ms. Adirzone were processed and paid in accordance with the terms of the Jefferson Plan.

91.     Thus, any administrative remedies that may be required to be pursued under ERISA have, therefore, been exhausted, should be deemed exhausted under applicable regulations, or would be futile under the circumstances, and are therefore excused as it related to Plaintiff's pursuit of plan benefits for the claims submitted on her behalf by Dr. Blechman.

## COUNT I
## (CLAIM FOR RELIEF UNDER ERISA, 29 U.S.C. § 1132(a)(1)(B))

92.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

93.     This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

94.     Aetna systematically violated the terms of the ERISA-governed Jefferson Plan by refusing to either: (i) pay billed charges of Drs. Tamburrino and Blechman in full, less only the member's in-network cost-sharing obligation; or (ii) negotiate an *Ad Hoc* Rate with the ONET providers to ensure its member, Plaintiff Judith Adirzone, is not subject to balance billing, causing

the Jefferson Plan to pay less in benefits than the plan terms required for the surgical services rendered by Drs. Tamburrino and Blechman.

## COUNT II
## (CLAIM FOR RELIEF UNDER ERISA, 29 U.S.C. § 1132(a)(3)(A))

95.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

96.     This count is brought pursuant to ERISA, 29 U.S.C. § 1132(a)(3)(A), to enjoin acts and practices of Jefferson Health and the Jefferson Plan, as detailed herein. Plaintiff brings this claim only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

97.     Aetna systematically violated ERISA and the terms of the Plaintiff's ERISA plan by refusing to either: (i) pay the billed charges of Drs. Tamburrino and Blechman in full, less only the member's in-network cost-sharing obligation; or (ii) negotiate an *Ad Hoc* Rate with the ONET providers to ensure its member, Plaintiff Judith Adirzone, is not subject to balance billing, causing the plans to pay less in benefits than the plan terms required for the surgical services rendered by Drs. Tamburrino and Blechman.

98.     Aetna also violated its ERISA fiduciary duties, including its duty of loyalty, because its decisions to: (i) deny in-network exceptions to Drs. Tamburrino and Blechman, ii) improperly deny plan benefits for co-surgeons performing complex microsurgery covered by the Jefferson Plan as required by WHCRA, (iii) failing to ensure claims are administered for the principal benefit of plan members such as Plaintiff, and (iv) breaching Defendants' duty to act in accordance with the written terms of its ERISA plans as constrained by applicable State and Federal laws and regulations, including but not limited to WHCRA.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Aetna as follows:

A.      Declaring that Aetna violated its legal obligations in the manner described herein;

B.      Ordering Aetna to repay on behalf of Plaintiff, with pre- and post-interest, the amount of benefits denied as a result of Aetna's ERISA violations as alleged herein or, alternatively, ordering Aetna to reprocess all wrongfully denied claims in compliance with plan terms and without the improper reductions described herein;

C.      Awarding Plaintiff disbursements and expenses of this action, including reasonable attorneys' fees, in amounts to be determined by the Court;

D.      Permanently enjoining Aetna from engaging in the misconduct described herein; and

E.      Granting such other and further relief as is just and proper.

[*Remainder of page left blank intentionally.  Certifications and signature on following page.*]

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 40.1

I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other pending or anticipated litigation in any court or arbitration proceeding, nor are there any non-parties known to Plaintiff that should be joined to this action. In addition, I recognize a continuing obligation during this litigation to file and to serve all other parties and with the Court an amended certification if there is a change in the facts stated in this original certification.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

I hereby certify that the above-captioned matter is not subject to compulsory arbitration in that the Plaintiff seeks, *inter alia*, injunctive relief.


Dated: March 22, 2024                    Respectfully submitted,

                                         */s/ Christopher B. Bladel*
                                         Christopher B. Bladel
                                         John W. Leardi
                                         BUTTACI LEARDI & WERNER LLC
                                         212 Carnegie Center, Suite 202
                                         Princeton, New Jersey 08540
                                         609-799-5150

                                         Leslie Howard
                                         Michael Fried
                                         COHEN HOWARD, LLP
                                         766 Shrewsbury Ave., Suite 200
                                         Tinton Falls, NJ 07724
                                         732-747-5202